Case number 18-1173 State of Maryland Petitioner v. Federal Aviation Administration Mr. Pilsen to the petitioner, Mr. Pat to the respondent Mr. Pat to the respondent Good morning, Your Honor. May it please the Court, Eric Pilsen for the State of Maryland. I would like to reserve three minutes for rebuttal. In 2015, the FAA changed the flight paths for aircraft arriving at Reagan Washington National Airport from the north in order to address noise complaints by Virginia residents. Even though the noise impacts in Virginia were great enough to justify moving the flight paths, the FAA did not conduct any analysis of how moving those noise impacts would affect Maryland residents, parks, recreation, and historic resources underneath the new flight path. NEPA, the National Historic Preservation Act, and Section 4F of the Transportation Department Act each required the FAA to analyze those impacts, and the FAA's complete failure to comply with those laws requires that the FAA's decisions be vacated and remanded. Before turning to the issues on the merits, I will address the procedural issue raised in the FAA's motion to dismiss of whether the petition was filed in a timely manner. 49 U.S.C. 46110A requires that challenges to FAA orders be made within 60 days of issuance, but the Court may allow a later filing, quote, if there are reasonable grounds for delay. This Court has addressed the reasonable grounds exception in this context, in the City of Phoenix case and in the Safe Extensions case. In those cases, the Court made clear that the key, quote, is whether the agency left the parties with the impression that it would address their concerns by replacing its original order with a revised one. Here, the FAA's conduct clearly created such an impression and gave Maryland reasonable grounds to refrain from initiating Where did it do that? In the December meeting? In the December meeting initially. Tell me exactly what, in the December meeting, left the impression in the way that the FAA did in Phoenix. Tell me exactly what. There were two things, Your Honor. First, and less important, but because it came first chronologically, was MWA's statement. It was what? The Metropolitan Washington Airport Authority. Oh, yeah. That it was committed to working with the FAA in the context of the community working group to address noise concerns. Okay, but that's not the FAA. That's not the FAA. That's right. Give me another one. What did the FAA say? The FAA statement that it could consider implementing a new GPS RNAV overlay to address noise concerns for residents to the north. And it made that statement open the door that it was open to considering and could consider new flight paths that address concerns with noise for northern arrivals. Followed up at the next meeting... But did that suggest it was... The question was the flight paths that were issued in April. It didn't say it would change them. It said it might consider future ones. But in Phoenix, they said, okay, we're seriously considering revoking these. We're going to take them back. They didn't say that in the December meeting. They said they might sometime in the future consider new flight paths. Well, two things. You're right. This is a different... Isn't that a pretty significant difference between this case and Phoenix? It is a different, but first, in the context, unlike Phoenix, here there is an established community working group that was formed to address these kinds of problems and to provide a forum for working out on a continuous, ongoing basis concerns with flight paths and noise impacts. And in that context, the discussion is, well, we have these new flight paths. Is there more that we can do? Yes, there is more that we can do. Well, but there's always more an agency can do, right? But the question is, what did they say at the meeting that led people reasonably to think that the ones in place would be revoked? That a new procedure could be developed to address these problems. Yeah, but then nothing would ever be final if that was sufficient because flight paths are changed all the time. I would say this, that if it ended there, it would be much harder for me to not accept your point. Okay. But it didn't end there. What else happened? At the next meeting in February, there was specific threat. But you see, the problem is that if nothing happened at the December meeting, as you seem to almost concede here, then we go back to the April issue of state and you should have filed by sometime in June. Well, I think the issue with the- The only reason that that would change is if something happened in December, right? Well, the April and then the June and August amendments to the April changes, there the issue is a little bit broader and we make the point in the brief of inadequate notice that these three procedures, the 2 April and the December 10 procedures, were intended to work together to address noise problems on the Virginia side. And yet there was nothing in the way that the April orders or changes were published that gave any indication that these three things were working together. And it wasn't until the December meeting that it became apparent that you were dealing with a unified set of procedures that would have a much larger impact than might have been apparent from looking at just the 2 April procedures alone. So I think it really isn't until December that there's any argument that 60 days begins to run because that was when everyone knew everything that was going to happen and how it would all fit together. That you would be eliminating two procedures that had previously been used from the north and that the river visual would be either flowing with the visually or using the new Fergie waypoint and the RNAV overlay. And to get back to your other point, after the December meeting opened the door and the FAA said, we can consider new procedures to address these problems, and they did. At the February meeting there was specific direction to do that and by April, the next meeting after that, they're going ahead and starting to develop the new procedure to address the problems. And they make specific reference in that meeting to complaints from, I think, this was the one with Congressman Van Hollen's residence, who are the residents in the Potomac area of Montgomery County who are most affected by these new changes. So there's a continuous process that begins on December 10 and carries forward right up until basically the time the petition was filed for the FAA's letter in April of 2018 of trying to develop ways to address the problems caused by the new procedures that went into place on December 10. You say a continuous process, but I have a chronology which lists essentially nothing new happening between April 2017 and March 2018, which is an 11-month gap. Well, reading that record, there are things that are happening during that time. The FAA is working on procedures. I agree there's nothing in the record that reflects a report back, but the FAA is working. So is there any case? Phoenix seems to be your best case, and that's one in which the delay was nine months, something like that. This is three years with one gap of 11 months. I have another one of four months relative to a 60-day filing deadline. I mean, is there any case that finds reasonable grounds with delays of that magnitude? I'm not aware of a case, Your Honor, but I don't think that's necessarily determinative. The basic standard is reasonable grounds, which gives the court wide discretion to find reasonable grounds for the delay. In this case of discretion, it doesn't compel us to excuse a late filing. No, no. This is a little bit like a tolling provision, and there's a general equitable principle that if you want tolling, you have to be pursuing your claim with reasonable diligence. Well, we were, and I think that's the point, is that through the process, there is a back and forth. The FAA is working on these processes. Maryland and others are trying to let the process work out. I mean, in Phoenix, for example, the process ended when the FAA decided not to make any changes, and the lawsuit followed. Here, progress was being made. And again, there was no reason, from Maryland's point of view, until the FAA pulled, sort of changed their position. What's the tangible sign of process other than the, you know, general bureaucracy speak of we'll look at this, we'll create a task force, we're sensitive to your concerns? Well, they're continuing to work on the procedures, and, you know, in March of 2018, the working group is recommending that the FAA meet with residents north of the subcommittee to explore further modifications to the RNAV GPS procedure that was under consideration. So the process was ongoing. And I think the question is always, why should a party, as the court said in Phoenix, why should a party be forced to sue earlier when there's a process ongoing that might lead to, or that has held up the promise of leading to a solution? Because there's final agency action with the force and effect of law. I mean, that's the general rule. I understand. But, again, under the city of Phoenix, if the agency is holding up a promise that the rule could be changed and is looking into, actively looking into changes, we're entitled, Maryland would be entitled to rely on that and not to file a suit in the hopes that that administrative process would lead to a solution without the need for litigation. So I think that's the basic, our basic position on the timeline is with respect to the merits very briefly, this is a case where there was absolutely, there's nothing in the record that indicates any environmental review whatsoever under NEPA, under the National Historic Preservation Act, or under Section 4F of the Transportation Department Act, even though this area, in addition to a heavily populated area, contains historic resources, recreation areas, and parks that are protected under the NHPA and Section 4F. The record is devoid of any environmental analysis whatsoever, even though the whole reason for the move was to address environmental concerns and complaints on the Virginia side. If there are no further questions, I'll reserve my time for rebuttal. Thank you. Mr. McFadden. Thank you, Your Honor. May it please the Court, Lane McFadden here on behalf of the Federal Aviation Administration, Administrator Dixon, and the Federal Respondents. In April 2015, the FAA made some small changes to this long-used arrival corridor into National Airport, and Maryland had by statute 60 days to seek judicial review of those changes. During that 60-day period, it did and said nothing. The same is true of the change made in December 2015, which the FAA announced and explained at a public meeting. And again, for a 60-day period following the publication of that change, the State of Maryland said and did nothing. It points to that meeting as the basis for its waiting to see if the FAA was going to resolve its concerns, solely because a participant at the meeting asked, could you bring even more traffic over the river by devising a new procedure that uses a different technology than these other procedures, a GPS-based technology? And the FAA said, well, we'll look into it. And then if you look at that, that conversation is captured in the minutes. This is at page 664 of the Joint Appendix. The FAA also says, we'll look into it, but you should know there are going to be some concerns. They'll fly over land. It's going to cause noise concerns, the types of things we're trying to avoid, but we'll consider it. More than 60 days go by with absolutely no contact from the State of Maryland. Then the noise working group says, all right, we formally endorse the FAA moving forward with this, and the FAA did look at it for several months. It comes back later in 2016. This is in September. And at that point, a Montgomery County representative who the State of Maryland says in its reply brief speaks for the state, rejected this procedure outright and said, this does nothing for us. This will not resolve our concerns. And the working group did not move forward with formally endorsing the procedure, which Maryland says it was closely monitoring these proceedings, and so it, of course, knows. The FAA is only going to actually develop a new procedure if the full consensus of the working group is behind it. The whole point of the committee is to get the competing geographic concerns of D.C., Maryland, and Virginia at the table and to resolve it and provide a joint proposal that everyone is happy with, so that the federal government is asked not to pick winners and losers. The story today of the continuous process of developing this new and different procedure is a story in which that February 2016 meeting is referenced, and then the next date mentioned in argument is March 2018, a spread of more than two years, during which Maryland did nothing to ensure that it had preserved its rights to judicial review, took no reasonable, prudent steps to preserve its rights. And there are, as was pointed out, many stretches of 60 days during that multi-year period during which Maryland made no statements and took no actions whatsoever that would indicate that it believed that this was all going to be resolved. Indeed, by 2017, the governor was sending letters, first to the administrator of the FAA in March, and later to the secretary of transportation in August, which all very clearly indicated the governor was frustrated the FAA had done nothing and believed it would do nothing, and asked for a complete revision of all air traffic procedures around the D.C. Metroplex area, which isn't just National Airport, would include Dulles and BWI. This repeated request had been repeatedly denied very clearly by the FAA. By September, the governor sends a letter to the attorney general of Maryland and says you must sue the FAA right away. They have done nothing to resolve our concerns, and it is clear they will take no action. The letter says, this is Exhibit 9 to our motion to dismiss, it says it is imperative you include both airports, both BWI and National Airport. And nine months later, after that letter, Maryland files a petition for review in this court. There is no sign at any point in this lengthy chronology of Maryland reasonably defending its right to judicial review by taking any steps to preserve it. And in that way, the case is wholly unlike the matter of the city of Phoenix, where in that case, the city came to the FAA within the week, indeed within the first couple of days of implementation of the procedures, and said, hey, you changed something. We want to talk about it. And the FAA, within the first 60-day filing period, said, look, we'll work to resolve your concerns, let's meet. They did hold public meetings. They met for several months, exchanged correspondence. There was never a 60-day period where no one did anything. And once that started to happen and the city could see that it wasn't going to get the resolution it needed, it protected its rights by filing a petition for review, which this court allowed. There's simply no analogizing the facts of that case to this one. The petition should be dismissed as untimely, and that, I believe, resolves the issues before the court. Why don't you analogize to the Citizens Association of Georgetown? Both Judge Tatel and I, in the last 18 months, have had a case in which property owners have worked with the FAA. It's almost – I don't want to use the term signature crime, but it's almost as if the FAA is meeting with property owners, saying, we hear you, we'll respond, we'll deal with it, and so forth. To lull them into this feeling that they do not have to necessarily meet the deadline, that the delay would be reasonable because they are working with you, they're relying on you. Now, analogize to the Georgetown case. Yes, Your Honor. And it seems like a pattern is really what I'm asking. Well, let me address both concerns. I mean, the specific question of analogizing to Georgetown, of course, that petition was untimely. It was some year and a half after the agency had issued its final decision, and that was about the finality of an environmental assessment and sort of a different NEPA process than was applied here. But Your Honor expressed this concern that the FAA might be stringing people along by saying, we sympathize with your concerns and we'll look into it for some indefinite period of time. And the FAA has taken great pains, and you can see it both in the letters exchanged and in the minutes of these working group proceedings, to say explicitly what we're talking about is we will consider putting new procedures in place to resolve your concerns, but we're not talking about reopening or revisiting the past final procedures that are implemented and published and are being flown. And we try to be very conscious of explaining that to people. And with respect to this corridor and the residents of Georgetown, and that is another thing you see in these minutes and in other meetings, it's not just arrivals but also departures, which are typically much louder, are a big concern. And there is being some, this is obviously outside the scope of this case, but there is some progress being made on those departures here in 2019, and there are some changes being considered. But none of those along the lines that Maryland says demonstrates some sort of continuous progress, when it has been Maryland itself in 2016 and 2017 that clearly indicated it believed resolution of the arrivals problem was long since passed. Well, let me ask you then, just apart from the petitions that are untimely, are you complying with NEPA? Are you complying with 4F? Are you complying with the environmental things you need to comply with? Yes, Your Honor, we are. We take those questions very seriously. And with respect to the categorical exclusion issue that's before you here, it's raised under an older version of our order. We have revised that order to require more documentation to address just those types of concerns. Thank you. Thank you, Your Honor. Does Mr. Kilst have any time left? Mr. Kilst does not have any time left. All right, why don't you take two minutes. Thank you. Very briefly, first with respect to the newspaper article that counsel references where the governor asked for a lawsuit to be filed, referred only to BWI. It was not referring to procedures coming international that are at issue here. And as counsel said, the FAA agreed at the December 10 meeting that they will look into the procedures. And the fine distinction that counsel mentions between changing the newly enacted procedures and issuing a new procedure is sort of a subtlety that one isn't readily apparent from looking at the minutes themselves. But more importantly, it really wouldn't be readily apparent to the people sitting at the community roundtable or the community working group in the state of Maryland observing. Because our concern, obviously, is changing the flight paths to address a noise problem. And I don't think we care how you do that, whether it's amending or replacing a new one. And in this case, the FAA is saying, starting at that December meeting, we will look into changing the flight paths to address your noise problems. And they did that. And Maryland reasonably relied on that process to find a solution to their problem and refrained from filing a lawsuit while that process worked out. I think that's the sum and substance of our case. This is very different from the Georgetown neighbors or the Georgetown case, because there was no engagement with the FAA at all. And simply the plaintiffs, as I understand it, essentially said, we didn't really know about this decision. And now that we've found out about it, we want to do something about it. That's very different than here, where there was this continuous engagement with the FAA, working towards a solution. On the merits, very briefly, the council cites to a newer version of the rules that would require documentation of a CADEX. That newer version went into effect in July of 2015, and the agency has offered no reason under the terms of its own order why they couldn't document the categorical exclusion they purported to apply in December over that five-month period. There's simply nothing in the record that indicates any environmental analysis, any impacts of these procedures whatsoever. Given that they were designed to address a noise problem, it was incumbent on the FAA to analyze the impacts of that noise problem. Thank you. All right. Thank you.
judges: Henderson, Tatel, Katsas